CUYAHOGA COUNTY BD. OF MENTAL RETARDATION, APPELLEE,
v. ASSOCIATION OF CUYAHOGA COUNTY TEACHERS OF THE
TRAINABLE RETARDED ET AL., APPELLANTS.

[Cite as Cuyahoga Co. Bd. of Mental Retardation
v. Association (1975), 47 Ohio App. 2d 28.]

(No. 34094—Decided December 11, 1975.)

Mr. John T. Corrigan, prosecuting attorney, for appellee.

Messrs. Green, Schiavoni, Murphy & Haines and Mr. John T. DeFazio, for appellants.

Mr. J. Ross Haffey, Jr., amicus curiae.

Jackson, J. On September 10, 1974, the Cuyahoga County Board of Mental Retardation filed a complaint for injunctive relief, along with a motion for a temporary restraining order and an application for a preliminary injunction. By that action it sought to enjoin the defendants appellants from striking in violation of the Ferguson Act, R. C. 4117.01, *et seq.* The stamped complaint, original court file and the appearance and execution docket all indicate that this case was originally assigned to Judge Adrian B. Fink. For some reason unascertainable from the record the motion for temporary restraining order and all subsequent proceedings were conducted before Judge Daniel O. Corrigan.

The motion for temporary restraining order was granted on September 10, 1974, after an *ex parte* hearing. On September 11, 1974, a hearing was held upon the application for a preliminary injunction and an order was issued restraining the appellants from continuing the strike; ordering them to return to work; and compelling them to "enter into further and meaningful negotiations forthwith."

On September 13, 1974, the appellants filed a document styled "Affidavit of Disqualification of Judge for Bias, Prejudice and Impropriety." By that affidavit the appellants sought a determination that Judge Daniel Corrigan was disqualified from hearing the case by reason of bias and prejudice. In support of their contention appellants alleged that Judge Corrigan was a former member of the Cuyahoga County Board of Education; that he had publicly asserted his sympathy for public employers in dealing with representatives of public employees; and that he had made certain statements and inquiries in the hearing for a preliminary injunction which the appellants considered to indicate bias and prejudice against them.

By an entry dated September 14, 1974, and filed on September 17, 1974, the trial court appointed attorney J. Ross Haffey, Jr., to be the "sole mediator" in the dispute between the parties. Mr. Haffey was to conduct the mediation within the guidelines the court orally presented in a hearing held on September 14, 1974. Further, the entry

stated that anyone willfully violating the instructions of the mediator would be found in contempt of court.

On September 24, 1974, a letter from Chief Justice C. William O'Neill of the Ohio Supreme Court, dated September 19, 1974, was filed in the Clerk's Office. By that letter the Chief Justice indicated that the affidavit of disqualification was seasonably filed and that no further action on the merits of the case "will be taken" until a ruling had been made upon the affidavit. Nevertheless, by judgment entries dated September 27, 1974, the trial judge dismissed the action with the agreement of the parties and awarded attorney J. Ross Haffey, Jr., the mediator, and attorney Floyd Oliver, his assistant, whose appointment does not appear in the record, fees totaling $5,850.

Subsequently, on or about October 3, 1974, the appellants filed with the Ohio Supreme Court a second document styled "Affidavit of Disqualification of Judge for Bias, Prejudice, and Impropriety."[1]

This second affidavit, instead of alleging facts which would indicate bias or prejudice, presented allegations of fact in support of a claim of improper interest. The central thrust of that affidavit was the sworn statement of the affiants alleging that an officer of the Board of Mental Retardation, Joseph Corrigan, was a brother of the trial judge and that Judge Daniel Corrigan was therefore disqualified to hear the case.

On October 9, 1974, the appellants filed their notice of appeal from the September 27th entry of the trial court. Subsequently, in an order dated September 30, 1974, but filed on October 9th, after the notice of appeal, the trial court purported to vacate the September 27, 1974 entries, acting upon its own motion.

On October 10, 1974, the trial judge, while acknowledging that he had actual knowledge of the pending appeal,

---

[1]This second affidavit, unlike the first which was filed in the Court of Common Pleas and forwarded to the Chief Justice, was filed directly with the Ohio Supreme Court. At the hearing on October 10, 1974, the trial judge inspected the affidavit, or a copy thereof, and read certain portions of the affidavit into the transcript.

proceeded to hold a hearing to discuss the issue of the mediators' fees. At the end of that hearing the trial judge recessed the case until November 1, 1974, and stated that he would proceed on the merits of the case. On October 28, 1974, the parties filed a stipulated dismissal entry pursuant to Civil Rule 41. The trial judge, on his own motion, vacated that stipulation of dismissal in an entry dated November 14, 1974. Subsequently, in an entry filed in the Court of Common Pleas on December 16, 1974, Chief Justice O'Neill ruled that the affidavit of disqualification was "well taken" and ordered the case transferred to another judge.

From the final order entered on September 27, 1974, the appellants have assigned four errors, each of which will be given separate consideration. In order to avoid confusion it must be noted that this court is concerned only with the acts of the trial court *prior* to the filing of the notice of appeal. This is so, because in situations such as this—where costs have been assessed; a dismissal entered which constitutes a final order; and a timely appeal has been taken—the trial court loses jurisdiction. *E. g., Vavrina* v. *Grecaznik* (1974), 40 Ohio App. 2d 129. Hence, all acts of the trial court subsequent to the filing of the notice of appeal are void for want of jurisdiction.

### I.

Appellant's first assignment of error alleges that:

"The trial court judge erred by participating in the present proceeding because his bias and prejudice disqualified him from judging the case with impartiality."

We find that this assignment of error is well taken, based upon three separate and independent grounds.

### A.

The oath of office of a judge, required under Section 7, Article XV of the Ohio Constitution and specified in R. C. 3.23 provides that a judge will "discharge and perform all the duties incumbent on him as such judge * * *." One of those duties is to conform his conduct to that set forth in the Code of Judicial Conduct. Section 3(C) of the Code provides, in relevant part:

"(1) A judge should disqualify himself in a proceed-

ing in which his impartiality might reasonably be questioned, including but not limited to instances where : * * *

" (d) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

" (i) is a party to the proceeding, or an officer, director, or trustee of a party * * *."

The sworn affidavit of two of the appellants states that the brother of the trial judge is and was, at all times relevant to these proceedings, an officer of the plaintiff appellee. These statements were not only uncontradicted but apparently provided, in whole or in part, the grounds for the ruling from the Chief Justice of the Ohio Supreme Court directing that the case should be reassigned to another judge. With the undisputed facts in this posture,[a] we conclude that the trial judge was under an obligation to disqualify himself. In reaching this conclusion we are careful to note that this is not a case where the facts are in dispute; where it is alleged that the trial judge did not know of the relationship or the position of his relative; or where there is controversy over whether the job of the judge's relative is one in which he can properly be classified as an officer.

Having determined that under the particular facts in this case the trial judge should have disqualified himself, we must next resolve the issue as to what is the effect of his failure to do so. In considering this matter we find ourselves

[a]The sworn statements of the two defendants are corroborated by a number of other circumstances. *First*, prior to the decision of the Chief Justice upon the affidavits for disqualification the trial judge did not seek to offer contradictory evidence either in the form of his own testimony, as was done in *State, ex rel. Pratt,* v. *Weygandt* (1956), 164 Ohio St. 463, or by means of submitting counter-affidavits as the judge did in *State, ex rel. Turner,* v. *Marshall* (1931), 123 Ohio St. 586. *Second*, in the October 10, 1974 hearing the trial judge examined the second affidavit of prejudice, went to great lengths to deny any bias or interest, and indicated that the proper place for the discussion of the Canons of Judicial Conduct was in the defendants' appellate brief. But there was no statement contradicting the portion of the affidavit which indicated that the brother of the trial judge was an officer of the plaintiff board.

in much the same situation as the Ohio Supreme Court 120 years ago when it stated:

"No authority is cited by counsel bearing directly upon this point, and few can be found; and for the reason, that in but few cases do interested judges ever pretend to sit in such cases." *Gregory* v. *Ry. Co.* (1855), 4 Ohio St. 675,

Nevertheless, having carefully considered these matters, we conclude that the trial judge was prohibited from hearing this case; that he was under a compulsory duty to disqualify himself; and that his breach of that duty rendered his subsequent actions null and void.

In reaching this conclusion we begin with the fact that Rule IV of the Supreme Court Rules for the Government of the Bar of Ohio provides that the Canons of Judicial Ethics are "binding" upon all judicial officers of the state. *See also, Bar Assoc.* v. *Franko* (1958), 160 Ohio St. 17, *certiorari denied* 358 U. S. 932 (1959). Further, the preface to the Code itself provides that the canons and text "establish mandatory standards unless otherwise indicated."

In examining the Code of Judicial Conduct it is apparent that while the permissible guidelines are indicated by the use of the word "may," the mandatory portions are set forth by the use of the word "should." This is entirely consistent with the plain meaning of a word which expresses an obligation or duty. *See* Black's Law Dictionary (4th ed. 1968); Webster's New World Dictionary (1963).

With this in mind we have no hesitancy in finding that the trial judge in the case at bar—a case in which the operative facts are not in dispute—was under a compulsory duty to disqualify himself. We further find that the attempt of a trial judge to exercise his authority as a judge in violation of his clear mandatory duty is of absolutely no effect. *See In re Dellenbaugh & Burke* (1899), 17 Cir. Ct. R. 106, *aff'm'd sub nom In re Frank Dellenbaugh, ex parte* (1900), 62 Ohio St. 658; *United States* v. *Amerine* (6th Cir. 1969), 411 F. 2d 1130.

We are not persuaded that these "mandatory" and "binding" standards were intended to be empty admonitions which a trial judge could openly disregard, subject

only to retrospective disciplinary action against himself, with no effect upon the improper actions which the canons were designed to protect against. Rather, we find that the design and purpose of the Code was to impose a standard of conduct upon judges to which they must conform. The duty of a trial judge under Section 3(C)(1)(d)(i) of the Code of Judicial Conduct, similar to that provided under 28 U. S. C. Section 455 (1975 Supp.) controlling the disqualification of federal judges, is one placed solely upon the individual judge. And like the attempt of a judge to exercise judicial power when prohibited by state or federal statutes, we find that such an attempt as exemplified herein was void. *See In re Dellenbaugh & Burke, supra; United State v. Amerine, supra.*

Nor do we believe any contrary result is mandated simply because in this case some of the acts complained of were those of the court appointed mediator. It is clear that the power of a referee or mediator is derived from the power of the trial judge, since the former is merely an agent of the latter. *See Strietelmeier v. Angelo* (1952), 66 Ohio Law Abs. 312; *appeal dismissed for no debat. constit. grounds* (1953), 159 Ohio St. 563; Staff Notes to Ohio Civil Rule 53. If the judge cannot lawfully exercise any judicial function in the case, he can neither validly appoint an agent to act in his stead, nor can the agent acquire any legitimate power through any purported appointment by that particular judge. Indeed, one of the earliest cases of the Ohio Supreme Court on this issue invalidated a judgment involving an appraisal of land to be condemned, not because of alleged interest on the part of the commissioners appointed to conduct the appraisal, but rather because of the interest of the judges who made the appointment of the appraisers. *Gregory v. Ry. Co., supra.*

For these reasons, we hold that the trial judge in the instant case had a mandatory duty from the beginning of the proceedings to disqualify himself from this case, and that his each and every subsequent act, being in violation of his clear and mandatory duty, was utterly void and without effect.

## B.

A second and independent reason this assignment of error is judged to be meritorious is because of the effect of the filing on September 13, 1974, of the affidavit of disqualification against the trial judge. Though the Supreme Court has stated that it is ordinarily better for a judge to disqualify himself when an affidavit of bias and prejudice has been filed, even if he is entirely free of bias and prejudice, *State, ex rel. Pratt,* v. *Weygandt* (1956), 164 Ohio St. 463, 471, *quoting Haslam* v. *Morrison, Judge* (Utah 1948), 190 P. 2d 520, 523, and though we recognize that such is the usual practice in Ohio, *Sexton* v. *Barry* (6th Cir. 1956), 233 F. 2d 220, 222, and favored by the law, *State v. Browning* (1967), 9 Ohio Misc. 228, 232, nevertheless, the mere filing of an affidavit of disqualification does not automatically disqualify a judge.

But the "mere filing" of such an affidavit does have at least a temporary effect; it deprives the trial judge of the power to proceed on the case until such time as the affidavit of disqualification has been ruled upon by the Chief Justice of the Supreme Court. This rule was first set forth by the Supreme Court in the case of *Wolf* v. *Marshall* (1929), 120 Ohio St. 216. At the time of the *Wolf* decision the statutory procedures were such that said statutes could be interpreted to provide for the automatic disqualification of a trial judge upon the filing of an affidavit of disqualification. Nevertheless, the Supreme Court had, by its decision in *Duncan* v. *State* (1910), 82 Ohio St. 351, determined that under the appropriate constitutional and statutory provisions a trial judge was to be disqualified only *after* a ruling upon the affidavit of disqualification by the Chief Justice of the Supreme Court. Thus, the provisions in 1929 for the disqualification of a judge were analogous to those which presently provide for the filing of an affidavit of disqualification in the trial court, R. C. 2701.03, but nevertheless provide that disqualification shall take place only after the matter has been passed upon by the Chief Justice of the Supreme Court or another Supreme Court Justice designated by him. Section 5(C), Article IV, Ohio Constitution.

36

In the *Wolf* case the trial judge held that the affidavit of prejudice filed against him was not timely, and proceeded to try the case. On appeal the issue presented to the court was whether the trial court could proceed with the trial prior to the determination of disqualification by the Chief Justice of the Supreme Court. In reversing the judgment, the court held that upon these facts "[t]he trial judge was without authority * * * to proceed with the trial and enter judgment therein * * *" and as a consequence the judgment was a "nullity" and had to be reversed and remanded. *Wolf, supra,* at 219-220.

Similarly, in *Tumbleson* v. *Noble* (1959), 109 Ohio App. 242, 244, the Court of Appeals summarized what it termed the "well established rule" upon this issue:

"* * * so long as the affidavit of prejudice is on file, and the issue of disqualification thereby raised remains undecided, the judge is without authority to determine the cause or hear any matter affecting the substantial rights of the parties."
*Accord, Wendel* v. *Hughes* (1940), 64 Ohio App. 310.

In light of the almost identical disqualification procedures in existence in 1929 and the present, we are bound by the decision of the Supreme Court in *Wolf* v. *Marshall, supra.* Even if this were not binding authority upon us, we would readily adopt such a rule since it follows the admonition of Canon 2 of the Code of Judicial Ethics providing that judges should avoid even the appearance of impropriety. For recognizing, as we do, that "[n]ext in importance to the duty of rendering a righteous judgment is that of doing it in such a manner as will begat no suspicion of the fairness or integrity of the judge." *State, ex rel. Pratt,* v. *Weygandt, supra, quoting Haslam* v. *Morrison, Judge, supra,* we cannot conceive of a rule that would allow a judge to proceed to adjudicate a case when the question of the judge's bias or prejudice has not yet been resolved. Under any set of circumstances we believe that such a view would bring suspicion of a lack of fair play upon not only the trial judge, but the entire judicial system. Obviously, this would apply, *a fortiori,* in instances such as this where the

Chief Justice of the Ohio Supreme Court ultimately held that the affidavit of disqualification was well taken and ordered the case transferred to another judge.

For these reasons we hold that once the affidavit of prejudice was filed, the trial court was without authority to proceed to hear the case or to determine any matter affecting the substantial rights of the parties.[8] In this case, each and every act of the trial judge subsequent to the September 13, 1974 filing of the affidavit of prejudice, including the September 14, 1974 appointment of the mediator and the subsequent actions of the mediator, see *Gregory* v. *Ry. Co.*, *supra*, were fatally defective and on that ground alone we would reverse.

### C.

A third reason we judge the proceedings below to have been prejudicially defective is rooted in the letter from Chief Justice O'Neill instructing the trial court to take no further action on the merits of the case *until* some disposition was made of the affidavit of prejudice. Section 5(C), Article IV of the Ohio Constitution vests in the Chief Justice of the Supreme Court the power to pass upon the disqualification of any judge of the court of common pleas. We find that based upon this constitutional provision and the inherent power of the Supreme Court, see *Cincinnati Bar Association* v. *Heitzler* (1972), 32 Ohio St. 2d 214, 222, *certiorari denied*, 411 U. S. 967 (1973); *Bar Assn.* v. *Franko* (1958), 168 Ohio St. 17, 21, *certiorari denied*, 358 U. S. 932 (1959), the Chief Justice also possesses the lesser included power to order a trial judge not to proceed further with the case until such time as the Chief Justice has had an opportunity to rule upon the affidavit of disqualification. Any other interpretation would make it possible for a trial judge tainted with bias, prejudice, or interest to summarily deal with matters which affect substantial rights of the parties.

---

[8] In reaching this conclusion we note that protection from abuse is provided by those cases holding that acts which are wholly administrative, *Ashland Bank & Savings Co.* v. *Houseman* (1915), 5 Ohio App. 165, or ministerial, *Tumbleson* v. *Noble* (1959), 109 Ohio App. 245, may be performed by the trial judge when the affidavit of prejudice has not yet been disposed of. Further, we believe that in extraordinary circumstances, which a court would record in its journal entries, the doctrine of necessity would apply to allow limited, emergency action. *See Benedict* v. *Seiberlin* (N. D. Ohio 1926), 17 F. 2d 831. None of these circumstances is present in the instant case.

Of course, holding as we do above, the letter from the Chief Justice and the assertion of his Constitutional and inherent power was nothing more than a reaffirmation of the already existing circumstances, and thus functioned only as a reminder to the trial judge of his existing duty not to proceed with the case. In this instance we simply recognize the separate and independent authority of the Chief Justice to order the trial judge to cease activity in the case. In such circumstances, even in the absence of the rule laid down by the Supreme Court in *Wolf* v. *Marshall, supra,* every act of the trial judge in violation of the instructions of the Chief Justice was invalid.

## II.

The second assignment of error by appellants alleges that:

"The trial court below erred in appointing a mediator to mediate the parties' labor dispute since the appointment of a mediator was not requested by the parties to the lawsuit."

The mediator, by his "Brief for Amicus-Appellee," argues that the only question raised by this assignment of error is whether the trial court has the power to appoint a referee without the consent of either party. If this were the case we would overrule the assignment of error, because it is quite clear that the use of the word "may" in Civil Rule 53 gives the trial court the discretion to appoint a referee with or without the consent of the parties. Any argument to the contrary can be quickly discredited by reference to Fed. R. Civ. P. 53, former R. C. 2315.27, and former R. C. 2315.40, each of which is said to have been a basis for Civil Rule 53 and each of which provided for appointment of referees, master commissioners or special master commissioners upon the motion of the court and without the consent of either of the parties.

However, in this case the above assignment of error directs our attention to another, more significant issue, evi-

dent upon the face of the record. That issue is: did the trial court have the power to appoint a mediator whose function was to officiate over negotiations compelled under the court's contempt power for the purposes of effecting a collective bargaining agreement between a public employer and a public employees union?

First, it must be recognized that the appointment of someone to function in this capacity cannot be justified under Civil Rule 53. In so holding, we are not quarrelling with terminology. We agree that it matters little whether an individual appointed to perform the functions outlined in Civil Rule 53 bears the title referee, master commissioner or mediator. But we do recognize that a person appointed under Civil Rule 53 can be appointed *only* to function in the manner authorized by Civil Rule 53. That authorization—the full extent of all possible duties—is set forth in Civil Rule 53(A) which provides that a referee or referees may be appointed "to *hear* an issue or issues" in a case (emphasis added). A careful examination of the remaining sections of Civil Rule 53 reveals that they give no independent powers, as argued by the mediator, but rather only constitute more explicit provisions for the exercise of power within Civil Rule 53(A). Further, Civil Rule 53, when read as a whole, clearly indicates, as does Civil Rule 53(A) standing alone, that the referee's duties are adjudicatory in nature. It contemplates that he will—as under the federal rule, and as under the former Ohio statutes—aid the court in doing its job by taking testimony, or otherwise in resolving factual or legal issues before the court.

We are not in any way suggesting that a trial court could not appoint a referee to gather evidence concerning the progress of negotiations for use of the trial judge in weighing the equities before making a decision as to whether equitable relief should or should not be granted. But such was not the case here. Both the instructions of the trial court—that the mediator would "lean on" the parties to effect settlement, and that the mediator was to supervise negotiations—indicated a non-adjudicatory role which is not authorized under Civil Rule 53.

We are not unaware of the authority to the effect that

courts have inherent power to order a reference, especially in. equity cases. *E. g., Toulmin* v. *Becker* (1952), 94 Ohio App. 524. But in light of the long-standing rule that reference is made only for the purpose of determining some or all of the issues of fact or law that arise out of a given lawsuit, *Lawson* v. *Bissell* (1857), 7 Ohio St. 129, we find that such inherent power would not justify the appointment of a person whose function was that of a mediator.

Finally, it has been suggested that the trial judge can grant relief not requested and that he has wide equity powers to effectuate the ends of justice. Even a court of equity is not without restrictions in its power and, while a court can surely grant relief which is not requested, it is without the power to grant relief to which a party has no legal right.

Unlike certain other states, Ohio has no statutory process requiring good faith negotiations for the purposes of collective bargaining between public employers and public employees. We take judicial notice that on numerous occasions proposals to give public employees and public employers correlative rights to require good faith negotiations have been introduced into the legislative process—but never enacted into law. Indeed, it has been only in recent years that it has been clearly stated that public employers even have the *power* to voluntarily enter into collective bargaining agreements. *E. g., North Royalton Edn. Assn.* v. *Bd. of Edn.* (1974), 41 Ohio App. 2d 209. To date the most comprehensive statement of the law dealing with the limits of collective bargaining in the public sector is that set forth in the *North Royalton* case, at 215, where Judge Jack G. Day stated that the school board's exemption from the National Labor Relations Act

"* * * leaves freedom to bargain, or not, untrammelled by federal legislation and *no Ohio statute specifically prohibits, allows, or compels it* [emphasis added]. Thus, the appellee has *no duty to bargain collectively* [emphasis added] to establish terms and conditions for its employees but this does not foreclose the questions whether it *may* bargain and what its responsibilities are if it *does* negotiate a collective bargaining agreement.''

Since, between public employers and public employees, there is neither a duty to bargain, nor a correlative right to compel bargaining, the attempt of the trial judge to compel such bargaining was in excess of his Constitutional power. We do not express any opinion upon the merits of the policy of compelling good faith negotiations as sought to be implemented by the trial judge in this case. We simply note that such policy considerations—determining whether or not to vest such a right—has been constitutionally set aside for the exclusive consideration of the legislative branch of government.

We are not suggesting that the trial court could not make the issuance or nonissuance of an injunction contingent upon the cooperation of one or both of the parties in voluntary negotiations either through the offices of the court or of another agency. But if one of the parties should decline that offer, then it simply shifts the equities to be considered by the court in determining whether it should or should not issue the injunction. There is no legal right to *compel* negotiations through mediation, nor is there any right to *compel* an agreement. The court cannot enforce such conditions by equity simply because it believes such to be good policy. There are limitations to the use of discretionary power, even for a court of equity. While the boundaries of that power are sometimes difficult to determine they certainly can be drawn at the limits of the enforcement of the legal rights of the parties. Otherwise, request for equitable relief would subject both of the parties to *any* action the court might consider "equitable" regardless of the legal rights of the parties. Based upon all these facts, we conclude that the trial judge was without any power or jurisdiction to compel mediation or to order collective bargaining. His use of the offices of the judiciary and his contempt power to accomplish the same was an unlawful and unconstitutional act, which was null and void.

## III.

The third error assigned by appellants contending that "the trial court erred in its failure to provide Defendants-Appellants notice and an opportunity for a hearing before taxing the mediators' fees as costs against them,"

and their fourth assignment of error charging that "the trial court's award of mediators' fees is unreasonable," are rendered meaningless by our disposition of appellants' first and second assignments of error. Further, with respect to assignment of error No. 3 we note that the record from the trial court indicates that the trial judge offered appellants several opportunities to have hearings upon these matters and that they waived each opportunity. Consequently, we overrule these assignments of error.

In summary, we find that the trial judge was disqualified from exercising his office as judge in the case at bar, and that his each and every act must be declared null and void. Further, we find that the appointment of a mediator by the trial judge under these circumstances was an act beyond the jurisdiction of the trial court and consequently, such appointment and the fees awarded were utterly void.

Accordingly, we order the judgment of the trial court reversed and grant judgment for appellants.

*Judgment reversed.*

DAY, J., concurs.
MANOS, J., concurs in the judgment only.